We'll hear argument next this morning in Case 13-720, Kimble v. Marvel Enterprises. Mr. Melnick. Thank you, Mr. Chief Justice, and may it please the Court. Berlotte's per se ban on patent royalties on post-expiration use should be discarded because it is a rule without a reason. Berlotte is widely recognized as an outdated and misguided decision that prohibits royalty arrangements that are frequently socially beneficial. Berlotte suppresses innovation and interferes with the goals of the patent system, increasing the likelihood that potentially breakthrough discoveries by universities and research hospitals, such as the Memorial Stone Catering Center, will never reach patients and consumers. Discarding Berlotte's ban on patent royalties on post-expiration use should be discarded because it is a rule without a reason. They are now, so what are they doing? I apologize. I mean, it's not like the industry has fallen apart. I don't see any examples of this. Well, the examples that we have are the amicus briefs. In other words, the entities that do this licensing on a day-to-day basis are telling the Court in their amicus briefs that the Berlotte rule is having this suppressive effect. In other words, that certain licensing arrangements that would otherwise occur. Why should that be so, given what you say in your brief, you say, this is at 9 and 10, bottom of 9. License payment terms consequently reflect the anticipated value of the authorization to use the patent in invention before the patent expires. All you have to do is make it clear that although the payments continue after expiration, they are for the pre-expiration period. So I don't understand why this should be so troublesome if the contract says these payments will be spread out over whatever period of time, but they are for the patent during the period when it was valid. If you say in the next sentences, even if they are nominally measured by post-expiration use, they nonetheless represent an amortization of the predicted value of the pre-expiration authorization. If you say that in the contract, then I don't see where there's a problem. The distinction, Justice Ginsburg, is between what you're paying for and how you're paying for it. The what that you're paying for is an estimate of the value of the use of the patent during the patent term. What Berlant currently permits is one method of how to pay for it, which is to defer payment into the post-expiration period. What Berlant doesn't currently permit is to defer — is to stretch the royalty base, to defer accrual into the post-expiration period. And deferred accrual allows parties to do something that deferred payment does not, which is to shift the risk of commercialization failure and innovation failure from the licensee to the licensor. Kagan. Aren't there ways to get around that as well? I mean, why don't you just enter into a joint venture? So, Justice Kagan, I guess my first answer to that is that's not the right question. The right question is, if you're prohibiting something that doesn't make sense, the initial question should be why are you prohibiting it. But — Well, possibly, except that we have statutory stare decisis, and to the extent that we think something's not really causing a problem in the real world, why overrule something against that basic backdrop principle? So the next answer to your question, then, is that the alternative arrangements are not risk-redistributive in the same way that royalty — the deferral of accrual is risk-redistributive. What do I mean by that? If you stretch the royalty base into the post-expiration period in situations where you're — where early-stage technology is involved, where there may not be any sales until fairly late and stretching into the post-expiration period, you allow the licensee to say, I'm going to take on this risk, but in exchange licensor, you're going to bear the risk that if the product fails, I won't have to pay much because if there aren't any sales, I don't have to pay you. Payment postponement, for example, doesn't allow the parties to do that because even if you postpone the payment, you still owe. The obligation to pay has accrued during the term, and even if you have to pay later, you still have to pay. That's the fundamental difference between payment postponement, which is not risk-redistributive and which is permitted by Burlough, and accrual postponement, which — Kagan Yes, but I was suggesting that either could be accomplished, both could be accomplished through other means. And particularly through just entering into a joint venture rather than having a license arrangement. So those kinds of arrangements may not be realistic for the kinds of entities that are most directly impacted by the Burlough Prohibition. And I think that's what I'm trying to get at here, which is that there are a lot of entities that are directly impacted by the Burlough Prohibition, universities, research hospitals, particularly. Kagan Is that what it is? Because when I was looking at the amicus briefs here, I was struck by the fact that there really are not companies on the amicus brief. There are not for-profit entities. It's all non-profit entities. And is that because non-profit entities have this particular problem, that they can't make the arrangements that would otherwise get around the Brulot rule? Well, it's not all non-profits. We had a — we had an amicus brief from Biotunga, which was a — a private company's. But one of the — one of the groups of entities that are most directly impacted are universities, research hospitals, and the like, because they're the ones where the — the — not all license — licensing situations are going to be a good fit for a cruel deferral. In many situations, this kind of arrangement may not make sense for the parties, and they wouldn't enter into it. One paradigmatic example of the situation where the parties may desire to defer a cruel but are prohibited by Brulot from doing so are very early-stage technology. And who generates early-stage technology? It's frequently universities, research hospitals, and the like. So yes, those are entities — one of the groups of entities that are most directly impacted by the law. Well, you — you quoted in your brief extensively by quotes from the hospital briefs and the research briefs, but these parties have recently been to Congress with reference to the whole drug and pharmaceutical industry. And Congress is certainly aware of this rule and has left it alone. And you're asking us now to add on to the remedies Congress has already given. Well, Justice Kennedy, I would say that not so recently. And I think that we have demonstrated special justification within the meaning of this Court's case law for overruling this kind of precedent. And I would say that we've demonstrated it in four ways. First, we have shown that since the Court considered Brulot, the patent equals market power presumption has fallen. And it — and it has fallen, actually, since the time — the last time that Congress looked at this, in 1988. There has been a foundational shift — second, there's been a foundational shift in competition law away from per se rules and toward contextualized rules such as the rule of reason. Third, economists and other experts in the licensing and patent field have reached a much more nuanced understanding of the economics of post-expiration royalties, an understanding that didn't exist at the time. Breyer. Those are the three points. And I just wonder, imagine I have a piece of intellectual property which I have patented. And now I have 55 potential licensees. And I say to each of them, I will license to you, and you will pay me next to nothing for any use up to 20 years, while you're figuring out how to use it. But if it turns out you use it in years 20 to 30, you pay me a lot for each use. Okay? That's the problem, isn't it? Now, I've done it for 55. And there are a lot of good reasons for getting them to do that. I understand the reasons. I just wonder how you reconcile that with the Constitution's requirement that patents are for limited terms and statute, which says the limited term is 20 years. Because if that means something, I suppose it means that after that statutory period of 20 limited years, people can use that intellectual property for free. Now, if it doesn't mean that, what does it mean? And if it does mean that, I mean, how did my example allow people to use it for free? Not — I mean, they couldn't use it for free. They had to pay. The way that I would reconcile it, Justice Breyer, is to decouple the notion of the right to exclude, which is what the statutory term is about, the right to prevent the public as a whole from using the patented invention, from the specific royalty arrangement. Once, as Chief Judge Posner put it in Schreiber, once the patent expires, expiration has accomplished what it was supposed to. It is, and everybody who might use this, by the way, inconceivable person, there were only 53 people who might ever use it, and I got 55 to sign up. And therefore, nobody is going to use it without paying. I'm just saying how, in my example, can we reconcile that with the Constitutional and statutory mandate that after 20 years, it's free? So let me make two points. First is we have to remember that what we're dealing with here is a per se rule. A per se rule prohibits all hypotheticals, not just one hypothetical. We're not advocating per se legality. In my case, it would be unlawful. I'm not saying that. I was getting to the second point. What's the second point? The second point is that one, is that in the post-expiration period, even in your situation, what we're really dealing with are the prices and outputs at which the public is going to access the invention. Breyer, in my example, the price and output is a big payment to the owner of the patent in year 29. That's the price and output. And the output is restricted because the price is up. So, but during the term, the licensee's got to use the invention in year 29. There are a lot of good reasons for it. My simple question was how you reconcile the fact that everybody is paying a lot of money to use this intellectual property in year 29 with what seems a statute and a constitution that say it should be free at that time. That's what I'm asking. I don't want to ask it again, because I don't like to ask a question more than four times. I have to apologize if I have not been clear in my answer. Let me take another shot at this. The answer to your question is that one needs to, in our view, is that one needs to decouple the right, the right to exclude, which is what the term is about, from the royalty arrangement. Understand that. Roberts. If by that you mean that there will be a lot of new people coming in who, because they don't have to pay the license fee in year 29, and it's very easy for them to figure out what to do because they can copy the patent, and anybody can come and see. I can make one of these. All the competition, in fact, everybody who was in the business, is paying an extra – has to charge an extra $2 because of this license fee. I won't have to charge an extra $2. I'll go into that business and make a lot of money. That's certainly correct, Mr. Chief Justice, and that's a point that we made in the brief. And the – Correct, only if unfortunately to get into this business, because the patent happens to be to do with a gizmo, and the gizmo is 14 feet deep, buried inside a computer, and the computer is 19,000 meters tall, and so there are only 55 people, conceivably, who could get into this business, and they are all licensed. So if the question is, can one come up with a hypothetical where the arrangement would be impermissible because it would violate the rule of reason, the answer is yes. Sotomayor, it's a fair question by the Respondents and others. Why are we importing antitrust principles, which already have their own set of problems? We have a rule of reason, and we've now done a quick look instead of a per se look, and everybody complains about the expense related to the rule of reason. Why are we importing into patent law the economic principle? You fault us for doing that in our original decision, but you're asking us to perpetuate that anyway. Antitrust law could take care of this by itself. We don't have to import this into patent law at all. So I guess I would question the premise that, Justice Sotomayor, that we're asking you to import the rule of reason, because the current standard that the Federal Circuit and other courts of appeals have applied to analyze patent misuse, and they've been doing it for decades, is already the rule of reason. Well, they use it for coercion and fraud. So why don't we do what one of your amici suggested, or one of the amici suggested, which is to say, reverse Brouillette and let coercion and fraud exist? That would be an approach that we also would think would make sense. That would be drawn on this Court's precedent in Zenith, and we would impose it. And I bet that in how long has Brouillette been around? Fifty years. In another 50 years, there will be an attorney sitting here telling us that we were wrong in that presumption, too. Why don't we just let Congress fix it? Because if it's wrong, people can complain to it. Well, so the answer to the question is that we – I would submit that we have demonstrated the special justification that this Court's precedent requires. Well, could you go back to that? Yeah. Because you named three things, and honestly, it all seemed to my ears different variants of Brouillette is wrong. But of course, special justifications demand more than the decision is wrong. So let's even say the decision is wrong. Economists think the decision is wrong. Everybody thinks the decision is wrong. That's not a special justification. What's the special justification? The distinction that I would draw, Justice Kagan, is between the decision is wrong argument is these arguments were presented to the Court at the time the Court made the decision, and now you are re-arguing those arguments. That's the decision is wrong argument. The points that I were making were new things that had emerged since the Court decided Brouillette. None of those arguments were presented to the Court. Well, but usually we ask for more than that. Usually we ask for something that says this is just unworkable. We thought it was right before, but we can't make it work now. That's not this. Or we say this is completely anomalous. It just can't – it's a relic of a past system that is utterly out of kilter. I don't think that's this either. You know, it may or may not be right, but there's nothing incredibly sort of weird and anomalous about it. I mean, usually we look for things like that, and where are those things? Well, one thing that we do have in this case that's unusual is the complete lack of reliance impact, if this Court has overruled. That makes, for example, makes it unusual. Even if I assume that that's right, that there's no special reliance push, still we have a very strong rule of statutory stare decisis. We need some special justification to break away from that rule. I guess I'm still waiting to hear what it is, other than, you know, we now know better than we knew before. So the – I had four points. I didn't get to get my fourth point out. So the fourth point was that we have a better understanding of the real world impact, of the innovation-suppressing effect of these kinds of royalty arrangements that we're hearing from the amicus briefs. But that surely is a question for Congress to go back to what Justice Sotomayor was saying. You know, to the extent that there's a real world problem, and maybe there is and maybe there's not, it's a little bit hard to tell from the amicus briefs. I mean, they're surely better equipped than we are to deal with that. So the same thing could have been said, for example, in Illinois Tool Works, which dealt with the exact same prior congressional enactment, with the exact same – one of the same bills that was – that was referred to in the red brief. And this Court, nevertheless, overruled the patent equals market power presumption responding to the overwhelming criticism of that presumption in the expert literature. We have the same here. We have near unanimous consensus in the expert literature that all of these new understandings have emerged since Verlotte has been decided that undermine every single premise on which Verlotte was based. And the same was true in Blundertung, which was the subject of the discussion in the first case this morning, where this Court overruled prior decisions in – and changed a judgment rule in the patent law context. And the government in that case filed an amicus brief that said the fact that Congress has failed to act, even though it has considered the issue as, quote-unquote, of no significance. So if the Court could do it in Blundertung and the Court could do it in Illinois Tool Works, the Court could do it here. Ginsburg. That was a case about preclusion. It was – it was really not a patent issue like what you're discussing. You're correct, Justice Ginsburg, that it was a case about mutuality of estoppel in patent litigation, but it implicated very important patent policy issues, because it asked the question of if you invalidate the patent once, is it invalid for all time, or can you relitigate the issue? So, yes, you can say that it was a procedural issue, but it was an issue that implicated core patent policy. But it was a decision that applies generally, applies across the board, not just in patent litigation. My recollection, and I apologize because it's been a few weeks since I read Blundertung, my recollection is that the issue was specific to mutuality of estoppel in patent litigation. Kagan. I guess what it seems to me you're arguing, and maybe we've done this before and maybe we haven't, but what it seems to me you're arguing is a sort of new rationale for when to depart from statutory stare decisis, and that new rationale is when a prior decision is based on what we now view to be naive economics. I mean, that's the fundamental argument here, isn't it? It's one of the arguments. I think it's all you also have to look at a new understanding of the real world impact, and it's not, it's not, it's not, it's not just the impact that Chief Judge Posner and the other people were saying. Okay. So let's say it's those two things. Because we think a prior decision is based on naive economics, and because we think that that decision has some bad real world consequences. But again, both of those things seem to me to be congressional choices much more than judicial choices. That it's Congress that's better positioned to assess the real world impact, and it's Congress that's better positioned to say whether these economic theories are indeed so naive. If — I guess I would submit that if that were the case, then the results of an Illinois tool works and Blundertongue would be different than they were. That the principle that you are espousing can't be a categorical principle. Stare decisis is, after all, a practical doctrine. And economics certainly plays an important role in antitrust, but what I've learned that economists frequently don't take account of is the administrative cost of administering, by judges, a complex rule. The point of my questions was to suggest to you how complex that would be. I mean, when, under a rule of reason which you advocate, would something like this be lawful or unlawful? Does it depend upon how many people you license? Does it depend upon the height of entry barriers, something that is notoriously difficult to estimate? Does — and what is the principle under which a rule of reason is violated? None of those things are decided. The — you're asking us to decide things under your system that I would find very difficult to decide, and the virtues of a simple rule are obvious. So it isn't even obvious to me that putting stare decisis to the side, it would be wise, since none of the economists, even including Judge Posner, do, in fact, discuss this problem of administering a complex rule of reason — rule of reason in a complicated area 50 years after the simple rule has been in effect. So two responses to your point, Justice Breyer. One is, I think it's, again, important to remember that the rule — the question is not whether the rule of reason should apply to patent misuse. The rule of reason already applies to patent misuse under decades of Federal Circuit precedent. That's the state of the world right now. The question is only whether these particular types of royalty arrangements should be aligned with the existing rule of reason regime for patent misuse that already exists in the world. The second point is that I think we need to remember that these are negotiated transactions, that this kind of royalty arrangement will only exist if the licensor and the licensee both agree that it makes sense for them, and any uncertainty can be priced into the license. After all, who is going to bear the risk of the rule of reason analysis? It's primarily going to be the licensor, because the licensee will at some point, presumably after expiration, will say, I don't want to pay royalties anymore. And it will be the licensor who will at that point have to initiate the lawsuit to collect the royalties. Roberts. It seems to me that the logic of your position is going to govern most of what you — you say, oh, you can always look at it under rule of reason, but it's hard for me to imagine what type of case would fail the rule of reason, given your logic for overturning Boulat in the first place. Well, just give me an example, that this would be permitted under your position but would violate the rule of reason. So I suppose the classic example would be the one that Professor Hovenkamp and his co-authors give at page 3-34 of the IP and antitrust treatise. This is at the end of Section 3.3c. So you can remind me which one it is. I was giving the citation just so that you can look it up later, because I'm sure I won't be able to summarize it as ably as they can. But they basically set out four conditions. One, the patent gives the patent owner market power in the relevant market. Two, the license requires licensees to pay royalties on all products sold in the market, regardless of whether or not they use the patented technology. So there's no one's — even if you stop paying the technology — using the technology, you still have to pay. There are substantial entry barriers, and the licensees make up most of the market. Sotomayor, I failed the antitrust case. Can the licensee come in and file an antitrust case? That would — Professor Hovenkamp and his co-authors raised that as a situation where there would be questions raised about whether that would violate the rule of reason. That was their example, that Chief Justice asked me for an example from the literature. That was — that's an example in the academic literature. Sotomayor, it goes back to my original question. Wouldn't the antitrust laws themselves already address that situation? The antitrust— Independent of Boulat or independent of Patent Law. The antitrust laws would also address that situation, if I may reserve the balance of my time. Thank you, counsel. Mr. Saunders. Mr. Chief Justice, and may it please the Court, this case should begin and end with stare decisis. Boulat remains correctly decided and serves important public interests grounded in Patent Law. But at this point, were any change needed, Congress would be the appropriate institution to balance the competing arguments and to consider the public and private reliance interests. Indeed, Congress specifically considered proposals to modify Boulat and declined to do so, even while making other changes to patent issues. After 1988, how recently has Congress taken a look at Boulat? The example I'm speaking of is 1988. I don't know more recently. But, of course, even without that specific compelling example of them having taken a look at it, made other changes to patent misuse and not changed it, the point remains that Congress could look at it at any time. And all of the complicated economic arguments— Roberts, well, that really proves too much. I mean, we overruled Lowe's, Albrecht, Arnold Schwinn. Those are all cases from the mid-1960s, just like this one was. It's a problem of the 60s. And we're going— The same argument you make now should have prevented us from doing that in all those other cases. I think that this Court has recognized that in the antitrust context, where you have such a bare-bones statute and a long history of very minimal congressional action in that area, this Court has had a greater willingness to overturn its precedent. In the Patent Act, this is an area where Congress has revisited it frequently, 33 times since 1952. Important to this case has revisited the patent term, changed the patent term, added patent term extensions, patent term adjustments, carefully calibrating the incentives to strike what it considers to be the correct balance with Broulat as settled law. And so there's a risk in overturning Broulat of upsetting that balance. I would also say as to the antitrust cases, and this point is made very nicely in the Washington Legal Foundation amicus brief, that the reliance interests in that situation looks different. From the perspective of the party that's going to be held liable or paying out, there's a big difference in moving from a per se rule of liability. No one's out there relying and saying, well, I'm certainly going to be liable if I do this, moving from that to rule of reason analysis. Whereas here, for the party that's going to be required to pay the perpetual royalties, what you have under existing law is the shield of Broulat in place, and you'd be talking about removing that shield after the fact. And we have a law here. There's a reason that in addition to the idea of statutory stare decisis, we give particular effect to stare decisis when we're talking about contracts and property rights, because for 50 years, parties have entered into agreements and made post-expiration business decisions with Broulat as settled law. And they've been in place for so long, in which there have been so many patent licenses, and in which, as we cite in our Broulat case, the reliance interests have been in place  for so long. So, if you have a patent interest that's not in the brief, you have treatise. Scalia I don't understand what the reliance was. What rel – what – how did they rely? By not including provision for post-expiration payments? That would be one form. The treatise we cite in our brief says, quote, it's not always necessary to specify the term. How would we be disappointing that reliance? I don't understand what reliance we would be disappointing. Frederick If someone doesn't specify the term in their licensee, because of the rule of Broulat, cuts off the royalties after patent expiration, if because of that they don't specify the expiration term. Scalia The only person I think we could be disappointing is the person who knows of this litigation, who knows of the post-expiration payments, knowing that that will be invalid. Now, him we would disappoint, wouldn't we? Sotomayor Someone who in these complicated negotiations may not think it's necessary to ask for a particular term. Sotomayor That's been conceded here. Marvel has said in this litigation, in your brief, I believe, that they didn't know about Broulat. Frederick That's correct in this litigation. Sotomayor This is no reliance by them. Frederick No direct reliance by them. I think it's – which doesn't mean it's not happening for other people. And I also think it's important to remember the idea of indirect reliance. Sotomayor I guess the only person who would be injured would be the licensor, because they'd be the only one acting in negotiation without knowing the legal rule. Frederick No, I – Sotomayor It should be Mr. Kimball who would be disappointed if we upheld Broulat, because he's going to be deprived of royalties that he thought he was going to earn. Frederick No, I don't think that that's the correct way of looking at it. And I also think it's important to remember that when you have a settled legal rule like this, it affects whether people even spot the issue. This issue has been taken off the table for five decades. No one's reading cases about the horrors of perpetual royalties. No one's going to continuing legal education courses and being told about this issue. So it may be –  But the economists are almost unanimous that this is a very bad rule. So it's not as if nobody is thinking about it. Frederick I'm talking about the parties that are engaging in those negotiations. But I also think that the economics here are disputed. I would refer the Court to the Baxter article that we cite. William Baxter, the William Baxter, before he was head of the Antitrust Division, does the economic analysis here, looking at the effect on the marginal costs after patent expiration. Roberts What's the date of that article? Frederick 1966. Roberts The whole point of the other side is that there's been a development in economic thought in the intervening 50 years. Frederick There has been – there have been developments in economic thought, but those developments themselves are currently being challenged in terms of analysis of the hyper-rational models. Kennedy Is one of the arguments that there have been years of reliance with making joint venture agreements, with making other contracts that don't – that don't depend on royalty payments, so that there's ways of getting around this? Because if that's an argument, it seems to me that that cuts both ways. It's easy to get around this rule, I take it, in many instances, by just having a joint venture agreement. Frederick There are many alternatives that would achieve the outcome. Kennedy Doesn't that cut against you as much as it cuts in your favor? Frederick No, I don't think so, because you still may have the parties out there who will be left exposed. You also have had what I would say is the legislative reliance in terms of Congress tinkering with the Patent Act and setting very specific balances with Brulat as settled law. And in addition to all of this, I mean, we've been talking in the economic criticism coming from the antitrust perspective, but it's important to remember here that this is originally grounded in patent policy. And what you have is Congress has set a limited window of opportunity in which you have the opportunity to capture, quite frankly, not just the value of your own invention, but a certain amount of follow-on invention that may build on and incorporate your invention. And that is set within that particular window. And once you begin going beyond that by contract, there's increased risk that what's going to cause sales to spike in the 30th year is not your own original innovation, but the follow-on innovation, the innovation of your licensee. Roberts But everybody is can do or can practice the patent after its expiration, and to the extent a licensee has to pay higher, charge higher prices because it has to make the license payments, that's an open invitation to people to enter. And those people are not inhibited by the patent because the patent term has been limited to the 20 years specified by Congress. The licensee, though, is maybe in the best position to be engaging in that follow-on innovation. And indeed, the same thing could have been said about this Court's decision in Scott Paper or even in Lear v. Adkins before Blonder Tongue, which you would say, well, that person is the only person who is on the hook, and they may continue paying, but the rest of the public could practice the expired patent in Scott Paper, or the rest of the public could bring their own invalidity challenge into the agenda. Roberts I suppose there would be barriers to entry in particular cases, and perhaps those are situations in which the rule of reason could be applied. But otherwise, in a competitive economy, the idea that you know exactly what you have to do to make a product, and this other person is selling it, you know, for $2 a widget more than you can, that seems to me to be a powerful incentive for entry. Dreeben It may be an incentive for entry, but it still conflicts with the long line of cases recognizing the patent policy interest in the completely free public domain and the issue that is established in Scott Paper. This Brulat followed very logically from Scott Paper, which is that we are not indifferent to the individual licensee. When that licensee ties their hands and obligates themselves to that ongoing royalty obligation, that, in turn, is affected by the public interest. And so Scott Paper, it was no accident that the courts of appeals were all reaching the same result as Brulat based on the authority of Scott Paper, which Petitioners have not asked this Court to overrule. So I think that although there can be nuanced economic arguments, we look at this in the antitrust frame, we may be talking about market entry in some situations and not in others, that wasn't the way that Brulat was approaching the question, and that if you move solely to a rule of reason analysis, all you're offering is a remedy that's already available. There could already be an antitrust suit in this case. So it effectively eliminates any separate patent-based doctrine in this area. And that is a big step that affects the patent. Sotomayor, I agree with you that I don't know why we need an antitrust test that already exists with respect to any patent and its use after its expiration date. But what do we substitute it with? Meaning, you're saying a patent-based system. So if we're thinking of substituting it, how would you do it? Well, it's not a substitution. It's that the Brulat rule was to ensure that no patent owner extended its monopoly against the licensee, that the licensee, like the general public, should be free to use the patent. So what do we say to keep that up without using the rule of reason? Well, it's free, that they're free to use the patent, and that to charge royalties for that is, is, is, conflicts with that policy because it's affecting their decision making. It's an ongoing marginal cost. And I think that it's very artificial to drive this, this wedge between the right to exclude and royalties. The patent right is a bundle of rights. You can have a right to exclude. You could push everyone out of the market and practice yourself. As a practical matter, the real value of the vast majority of patents, particularly after eBay, where you may not get injunctive relief, is the statutory right to damages, damages defined in Section 284 as being at a minimum a reasonable royalty. So you have a system set up in which one of the sticks in that bundle of rights being given to you by Congress for that limited term is your right to engage in royalties. And so I don't think we can drive this artificial wedge between the two. Sotomayor Well, I know you don't want us to, but let's assume someone wants to, that we think Brulat was wrong economically by the arguments of the other side, that it hurts the market. How would you substitute it? How would you think you would protect your interests without using the rule of reason? Goldstein, I mean, if we are talking about fallbacks, and I assume the question is, assuming that we've gotten past stare decisis. Sotomayor Exactly. Goldstein, then I think that at a minimum you need to have what we've discussed as being a presumption against this practice. And if there are specific instances in which someone can come in and show that this comports with patent policy and this is going to be pro-innovative, then they can litigate that. But I think to go to Justice Breyer's points, you're talking about, on one hand, as Justice Kagan's questions are eliciting, very speculative and uncertain harm, given the flexibility that's already allowed to amortize payments under Brulat. And on the other hand, the certainty and expense of a very difficult-to-apply legal regime. Roberts, but amortizing the payments under Brulat is very restrictive. What you're saying, those payments have to be related in some sense to the patent period. You cannot take into account events after that. And yet I would think one of the risks are, well, maybe we'll be able to turn this invention into something or maybe we won't, and so we have to give, you know, license fees that take that contingency into account. But you can't do that under Brulat because that can only refer to the period that's left on the patent. Right. Under Brulat, you have 20 years in which you can do absolutely anything, can account for all of your risks in that period in terms of whether the product has taken off. And what you can't do under Brulat is say, if the success, if this is accruing on use after that 20-year period, then we're going to be capturing that. But I think that crystallizes the problem, the conflict between Petitioner's position and the patent policy here, is what you're really saying is my invention is such that 20 years isn't long enough for me. It's not going to realize a success until after the 20-year period. The fact that you may not be able to capture that is a direct consequence of the decision Congress made when it set the patent term. And, in fact, for the concerns that are raised by particular industries, those are concerns that Congress has not been deaf to it, to them. It passed the Hatch-Waxman Act in 1984, specifically targeted to the pharmaceutical context. People had concerns about patent life being consumed during patent examination. Congress came back in 1999 and set up a series of patent term adjustments to compensate for that. And if there are any industry-specific concerns, given the complexity of the economics here, given the disputes that we're having about the reliance interests, this is clearly quintessentially a task for Congress to weigh at this point, particularly since we're talking about a rule that has stood for 50 years and during that time has become part of the fabric of the law. If the Court has other questions, I'll address them briefly. Roberts. Thank you, counsel. Mr. Stewart. Mr. Chief Justice, and may it please the Court. This Court's decision in Brulotte is not an outlier, but instead fits comfortably within a substantial body of decisions that recognize a strong Patent Act policy favoring unrestricted public access to unpatented and previously patented inventions. And these cases fall into two basic categories. The first is cases like Bonito Boats, Comco, Sears Roebuck, where the Court held to be preempted State laws that would provide patent-like protection to inventions that either were not patentable under Federal law or inventions as to which a Federal patent had expired. And typically, those State laws that were held to be preempted took the form of prohibitions on the copying of products that were already in the market. And the Court in those decisions didn't apply anything that looked like rule of reason analysis. It really didn't apply economic analysis at all. It didn't purport to say that the economy would be worse off if these laws were allowed to be enforced. It simply said those laws are inconsistent with the balance that Congress has struck, both between what is patentable and what is unpatentable, and the balance that Congress has struck as to what the length of patent protection should be. And the Court could have drawn a sharp distinction between prescriptive State laws and private contractual arrangements, but it didn't. And I think in addition to Brillat, the two cases that I would point to that fall into the second category are the cases that Mr. Saunders has mentioned, Scott Paper and Lear. In Scott Paper, the Court said that if even a single licensee was allowed to enter into a binding restriction on his use of the patented invention after the patent expires, the consuming public would be deprived of full unrestricted access to the patented invention. And two points there are crucial. The first is the Court recognized that even though the restriction that was sought to be applied in Sears would bind only a single person, wouldn't prevent others from using the patented invention after the patent expires, nevertheless, that was regarded as a restriction inconsistent with Federal patent policy. And the Court explained that was so in part because when a single licensee is restricted in his ability to use the formerly patented invention, it's not only he who suffers, it's the consuming public who could otherwise hope to buy the products that he manufactures. And the second case is Lear, where the Court held after Brulat that even when a licensee has entered into a contractual promise not to challenge the patent and to continue to pay royalties during the pendency of any challenge that may arise, the licensee can repudiate the license, can challenge the patent itself, can cease paying royalties. Obviously, it takes the licensee in that circumstance, takes the chance that it may have to pay damages if the patent is held to be valid, if the patent is held to be valid, but if the licensee is correct, if the patent is invalid, its contractual arrangement will not prevent it. Sotomayor, do you take issue at all with the economic theory of all of the amici that have filed in the antitrust areas saying this makes no sense economically? I'd say we do take issue to some extent, because at least some of the criticisms are based on the misconception that Brulat prohibits extending royalty payments out past the date of patent expiration. And Brulat properly understood, as the Petitioners recognize, prohibits royalties that accrue based on post-expiration use, but it doesn't prohibit the post-expiration payments of royalties that are calculated based on use during the patent. So to that extent, we do disagree. I think also a lot of the antitrust criticism has been to the effect that, and we agree with this as far as it goes, that viewed as a matter of modern antitrust law, a per se rule of illegality would not be warranted, because the per se rule is reserved for situations in which rule of reason analysis would always or almost always condemn the practice. And so if a particular practice is pro-competitive in even a significant range of cases, it should be analyzed under the rule of reason for antitrust purposes. And we don't disagree with the critique that Brulat rule would not be a sound one of antitrust policy. But even to say rule of reason should be applied because this is not always anticompetitive is not going as far as saying that, on balance, the Brulat rule causes more economic harm than benefit. I don't know to what extent the economists have really made that case. We don't think it's been proved one way or the other. It seems to us to be a criticism that's much more soundly directed to Congress. The other thing I would say about- Scalia Excuse me. What benefit do you see coming from the rule? I mean, if you're just analyzing it, you know, economically, as we would do for antitrust analysis, what are the economic benefits of the rule? Arrangements like the ones at issue here can cause economic harm in the sense that they prevent the licensee from making unrestricted use of the product after the license expires. The licensee may, in certain circumstances, determine that it's not feasible to sell the thing at a profit if it has to pay the royalties. At the very least, it will presumably bake the royalties into the price it charges to consumers. Now, there is an argument on the other side this is more than made up for by the fact that the licensee will presumably be charged less while the patent is at fault. Scalia What are the harms? What are the benefits? The benefits in terms of economics are that the licensee, or after the patent expires, can make decisions about whether to exploit the invention, what sort of follow-on products to devise that may incorporate the patented invention, without any disincentive created by the obligation to pay royalties. Breyer In a word, you have a higher price after the 20 years is up, and a higher price means a restricted output. That's correct. Any other antitrust harm? Stewart That's correct. But I think the other point I would make is, and I take your point, Mr. Chief Justice, that the 1960s are often associated with loose economic analysis, but I think for a lot, not only was not an antitrust decision, I think for better or worse, the Court really didn't rely on economic analysis of any sort. That is, it said the balance that Congress struck was that during the period when the patent is enforced, you can basically charge whatever royalties the market will bear. After the patent expires, the invention is supposed to be available for free, unrestricted use for the public, and you can't trade one for the other. It's essentially the same mode of reasoning that the Court used in cases like Benito Boats and Sears Roebuck. The analysis was not, although it might or might not have been true, this will cause economic harm to allow States to restrict copying in this manner. The argument was simply, this is not the balance that Congress has struck. And I wanted to return to Lear for a second, because this was a case in which the Court applied the same basic mode of reasoning to a private contractual arrangement. That is, the Court recognized in Lear that the agreement potentially bound only the licensee, that is, any other member of the public could have challenged the validity of the patent. But as Mr. Saunders said, the Court pointed out that the licensee may often be in the best position, both because it has knowledge of the patent's workings and because it has the economic incentive to try to escape the royalty obligation. The licensee may be in the best position to challenge the validity of the patent, and therefore a restriction that binds only the licensee is less sweeping than one that binds the whole State or the whole country, but it's still not just like a restriction on a randomly selected individual. I guess the other thing I would say about the Sloan-Kettering brief and the argument that is made there is that undoubtedly the Broulat rule sometimes prevents contracting parties from agreeing to the precise mix of burdens and benefits that they would prefer. But there's really been no evidence that the effect of the Broulat rule is to prevent these agreements from being formed at all, as opposed to there being — causing them to be formed on terms that are somewhat suboptimal from the standpoint of the contracting parties. The second thing we would say is to the extent that there's evidence to show real substantial harm in terms of impairment of licensing agreements, again, that evidence is better considered and evaluated by Congress. The other thing I would say is that the situation in which the Sloan-Kettering brief is most clearly directed at is one in which it's necessary to do substantial non-remunerative work as a preliminary matter during the period while the patent is in force in order to be able to monetize the invention down the road. And that's why they say, well, use during the period while the patent is in force is not a real — a sound estimate of the value of being able to exploit the patent. But those are precisely the cases in which it's most likely that after patent expiration, competitors will face barriers to entry. I mean, to say that you need to do a lot of preliminary work before you can make money is to say that people who haven't done the preliminary work may face difficulties in becoming competitors. And so on the one hand, that's a situation where the licensees might prefer not to have a burlap rule in place, but it's also a situation in which a burden on the licensee is most substantial. If there are no further questions. Thank you. Thank you, counsel. You have four minutes remaining, Mr. Melnick. Thank you. Thank you, Mr. Chief Justice. I think it bears reemphasis that what we're dealing with here is a per se rule. Petitioners are not asking this Court to shift to a regime where patent royalties on post-expiration use are always permissible. Petitioners are asking this Court to lift a barrier, a per se barrier, against these royalty arrangements. And under this Court's precedent, what would that rule of reason be, a patent rule or an antitrust rule? Well, I think that's a patent rule. Where does it come from? Where is it in the patent statutes? Well, Justice Scalia, patent misuse, when it initially originated, wasn't in the patent statutes either. It didn't appear in a narrow sense until the 1952 Act when Congress acted to overrule certain decisions of this Court. So as the law stands today, the rule of reason is the standard that the Federal Circuit uses to assess patent misuse. So where does it exist today? It exists in the Federal Circuit's case law on patent misuse. So the question, I think, that needs to be asked is, even if you view it as solely an antitrust rule, which it's not on the current state of the law because of the Federal Circuit's case law, the question that needs to be asked is, what patent policy exists that would justify some rule beyond the rule of reason? And I would submit that neither the government nor Respondents have demonstrated any patent policy that is not, at its core, an economic policy. If you look, take a close look at Respondents' patent policy argument, it ultimately reduces to a question of prices and outputs in the post-expiration period versus pre-expiration period, and that is essentially an economic question. But to follow up on something that Justice Sotomayor earlier said, Petitioners would be content with an alternative that draws on this Court's zenith decision and a test that focused on coercion as an alternative to a rule of reason analysis. I think either would be appropriate. If the Court has no more questions. Roberts. Thank you, counsel. The case is submitted.